UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                              *
          V           *
                              *
BRIAN FOLKS              *
MANDY LATULIPPE          * CRIMINAL FILE NO. 16-94


DETENTION HEARING
Monday, July 25, 2016
Burlington, Vermont


BEFORE:

      THE HONORABLE JOHN M. CONROY
          Magistrate Judge


APPEARANCES:

      HEATHER E. ROSS, ESQ., Assistant United States
          Attorney, Federal Building, Burlington, Vermont;
          Attorney for the United States

      MICHAEL J. STRAUB, ESQ., Law Office of Michael J.
          Straub, 19 Church Street, Suite 9, Burlington,
          Vermont; Attorney for Defendant Folks

      KATINA FRANCIS READY, ESQ., 16B Main Street,
          Bristol, Vermont; Attorney for Defendant
          Latulippe


ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# <u>I N D E X</u>

**E X A M I N A T I O N**

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **CHRISTOPHER DESTITO** | | |
| Direct by Ms. Ross | 19 | 6 |
| Cross by Mr. Straub | 28 | 3 |
| | 38 | 25 |

1  MONDAY, JULY 25, 2016

2  (The following was held in open court at 11:00 a.m.)

3      COURTROOM DEPUTY:  Your Honor, the matter

4  before the Court this morning is criminal action

5  16-CR-94, United States of America versus Brian Folks,

6  who is present in the courtroom today represented by

7  attorney Michael Straub, and Mandy Latulippe, who is

8  also present in the courtroom represented by attorney

9  Katina Francis Ready.  Representing the government this

10 morning is Assistant United States Attorney Heather

11 Ross.  And we are here for the purpose of a detention

12 hearing.

13      THE COURT:  Good morning.

14      MS. ROSS:  Good morning, your Honor.

15      MR. STRAUB:  Good morning.

16      MS. READY:  Good morning.

17      THE COURT:  We are here as the clerk indicated

18 to consider the government's motions for pretrial

19 detention with respect to defendant Folks and defendant

20 Latulippe.  Does either side intend to present any

21 evidence?  Miss Ross?

22      MS. ROSS:  The government may present evidence

23 in the matter of Brian Folks depending on the proof that

24 the defense may offer to meet the rebuttal presumption.

25      THE COURT:  Okay.  Does Mr. Folks intend to

1    present any evidence or rely on the information set

2    forth in the pretrial services report?

3           MR. STRAUB:  We will be relying on the

4    information in the pretrial services report, Judge.

5           THE COURT:  Okay.  And with respect to

6    defendant Latulippe, any evidence to present or do

7    you -- will you be relying on the report of the pretrial

8    service agency?

9           MS. READY:  We would be relying on the report,

10   Judge, but I am also relying on the government's

11   representation the last time we were here, last week.

12       Mr. Van de Graaf said that he would be inclined to

13   recommend release but he was waiting to receive a final

14   copy of the pretrial services report.  So I am going on

15   the understanding that that would be the government's

16   recommendation at this time.

17          THE COURT:  Okay.  Miss Ross, what's the

18   government's recommendation position on Miss Latulippe?

19          MS. ROSS:  The government's position is as

20   Miss Ready represented.  We do not intend to move

21   forward with detention with respect to Miss Latulippe.

22          THE COURT:  Okay.  So document number eight,

23   the government's motion for detention in the matter of

24   United States of America versus Mandy Latulippe, is

25   denied as moot.

1          Does the government have any comments or concerns

2    about the conditions that have been proposed with

3    respect to Miss Latulippe?

4          MS. ROSS:  We do not, your Honor.

5          THE COURT:  Miss Ready?

6          MS. READY:  My client's fine with all the

7    conditions, Judge.

8          THE COURT:  Okay.  Miss Latulippe, would you

9    please stand.

10         Miss Latulippe, in connection with this matter I am

11   going to be signing an order setting conditions of

12   release.  And at this time I am going to explain those

13   conditions to you, that everything I am about to tell

14   you is set forth in a three-page order which you will

15   receive a copy of at the conclusion of today's hearing.

16         You are going to be released on your own personal

17   recognizance which means you are promising to appear in

18   court when required to do so and to surrender to serve

19   any sentence that may be imposed in this matter.  While

20   out on release, you will be subject to the following

21   general conditions:

22         You must not violate any federal, state or local

23   law.  You must cooperate in the collection of a DNA

24   sample if collection is authorized under federal law.

25   You must immediately advise the court, your attorney and

1    the U.S. Attorney in writing before you change your

2    residence or your telephone number.  And again, you must

3    appear in court as required, and you must surrender to

4    serve any sentence that may be imposed.

5         Miss Latulippe, in addition to those general

6    conditions, I am going to impose the following specific

7    conditions:

8         You will be required to report to the United States

9    pretrial service office as directed.  You are to

10   maintain or actively seek employment.  You are to abide

11   by the following restrictions on your personal

12   association, your residence or your travel.  Those

13   restrictions are as follows:

14        Your travel is restricted to the state of Vermont

15   and any other travel that may be approved in advance by

16   the pretrial service office.

17        You are to avoid all contact, directly or

18   indirectly, with any person who is or may become a

19   victim or potential witness in the investigation or

20   prosecution, including the individuals identified by the

21   government as witnesses in the case, as well as the

22   co-defendants in this indictment.

23        You are to refrain from possessing a firearm,

24   destructive device or other dangerous weapon.

25        You are to refrain from the use or unlawful

1   possession of a narcotic drug or other controlled

2   substance as defined in 21 USC, section 802 unless that

3   substance is prescribed to you by a licensed medical

4   practitioner.

5       Mr. Bendzunas, I didn't see a drug testing

6   requirement; is that -- that should have been included?

7           PROBATION OFFICER JOHN BENDZUNAS:  Miss

8   Latulippe is currently on probation with the state and

9   she is subject to a drug testing.  We did not select

10  that condition for our purposes since we found no

11  evidence of a substance abuse issue.

12          THE COURT:  Okay.  Miss Latulippe, you are to

13  report as soon as possible to the pretrial service

14  office or supervising officer any contact you have with

15  law enforcement personnel, including but not limited to

16  any arrest, any questioning or even a traffic stop.

17      You are to maintain contact with your attorney, and

18  you are to abide by all conditions of probation under

19  the State of Vermont criminal case docket number

20  1287-415CNCR.

21      Miss Latulippe, do you understand these conditions?

22          DEFENDANT LATULIPPE:  Yes.

23          THE COURT:  Do you have any questions of me?

24          DEFENDANT LATULIPPE:  No.

25          THE COURT:  Okay.  Miss Latulippe, the law

1    requires me to advise you of the penalties and sanctions

2    that would arise in the event you violated these release

3    conditions, so I will advise you as follows:

4        Violating any of the foregoing conditions of

5    release may result in immediate issuance of a warrant

6    for your arrest, revocation of your release, an order of

7    detention, a forfeiture of any bond and a prosecution

8    for contempt of court and could result in imprisonment,

9    a fine or both.  While on release, if you commit a

10   federal felony offense, the punishment is an additional

11   prison term of not more than 10 years, and for a federal

12   misdemeanor offense, the punishment is an additional

13   prison term of not more than one year.  The sentence

14   must be consecutive, meaning in addition to, any other

15   sentence you may receive.

16       Miss Latulippe, it is a crime punishable by up to

17   10 years' in imprisonment, a $250,000 fine or both to

18   obstruct a criminal investigation, to tamper with a

19   witness, victim or informant, to retaliate or attempt to

20   retaliate against a witness, victim or informant, to

21   intimidate or attempt to intimidate a witness, victim,

22   juror, informant or officer of the court; and, Miss

23   Latulippe, these penalties for tampering, retaliation or

24   intimidation is significantly more serious if the

25   conduct involves a killing or an attempted killing.

1      If, after release, Miss Latulippe, you knowingly

2   fail to appear as these conditions of release require or

3   to surrender to serve a sentence, you may be prosecuted

4   for failing to appear or surrender.  An additional

5   punishment may be imposed.  And, in fact, there is a

6   schedule of additional punishment set forth on page

7   three of this order setting conditions of release, and I

8   call your attention to that page.  But a term of

9   imprisonment imposed for failing to appear or surrender

10   will be consecutive to any other sentence you may

11   receive.

12      Now, you will have to meet with the deputy clerk

13   who sits in front of me and sign an acknowledgment of

14   these conditions.

15      One last time, Miss Latulippe, do you have any

16   questions of me?

17            DEFENDANT LATULIPPE:  No.

18            THE COURT:  I can't hear you.

19            DEFENDANT LATULIPPE:  No.

20            THE COURT:  Okay.  With regard to directions

21   to the United States Marshal, Miss Latulippe is ordered

22   released at the conclusion of any necessary processing.

23      Okay, let's take up the matter of Mr. Folks now.

24      The grand jury's finding of probable cause gives

25   rise to a presumption under the law that there is no

1    condition or combination of conditions the Court could

2    set to reasonably assure either Mr. Folks's continued

3    appearance here in court or the safety of the community.

4    That presumption shifts the burden on Mr. Latulippe

5    *[sic]*.  It is a limited burden of production to come

6    forward with evidence that contradicts that notion of

7    dangerousness or risk of flight.

8         From Mr. Straub, I will hear you on this motion.

9              MR. STRAUB:  Thank you, Judge.

10        Judge, I think the pretrial services report sums it

11   up best in that there are conditions of release that

12   would assure his appearance and the safety of the

13   community as outlined in the attachment to the report.

14        I'd ask the Court to consider that contrary to

15   what's represented in the government's motion for

16   detention at page three, that the defendant did not

17   commit the charged conspiracy while on pretrial release

18   for a state violent felony.  From what I can tell, that

19   must be referring to a charge of aggravated sexual

20   assault in 2014, but Mr. Folks was detained during that

21   period of time, so the government's assertion is

22   inaccurate.

23             THE COURT:  Would you say that again for me?

24   For --

25             MR. STRAUB:  So that on page four, I think --

1  five of the pretrial services report, the top --

2          THE COURT:  Yes.

3          MR. STRAUB:  -- box, the charge there --

4          THE COURT:  Yes.

5          MR. STRAUB:  -- I believe is sexual assault.

6          THE COURT:  Yes.

7          MR. STRAUB:  Between September of 2014 and

8  February of 2015, which appears to encompass -- well,

9  this is where it gets confusing to me.  He was detained

10  during that period of time.  The disorderly conduct for

11  fighting I don't believe can be characterized as a

12  violent offense -- violent felony, certainly not a

13  felony.  And the grand larceny greater than 900,

14  perhaps, you know, it's -- wasn't a violent felony in

15  state court.  I don't know why the government then is

16  alleging that -- on their motion that he committed the

17  conspiracy while on pretrial release for a state violent

18  felony.  So --

19          THE COURT:  Mr. Straub, let me interrupt you

20  for a moment.  I too was confused by that statement, and

21  I recognize that the government didn't have the pretrial

22  services report at the time it drafted its motion.

23      Miss Ross, can you clarify what the assertion is

24  with respect to that?

25          MS. ROSS:  My understanding is that in the

1    summer of 2015, Mr. Folks was, in fact, on release for

2    both the disorderly conduct and the grand larceny

3    greater than $900 state charges, and the conspiracy

4    charge as returned by the grand jury reflects that he

5    was engaged in this drug conspiracy beginning in May

6    2015 and continuing until March 2016, so that while on

7    court-imposed conditions from the state court, he was

8    continuing to commit crimes.

9              THE COURT:  I think Mr. Straub was focusing

10   his argument on the representation that Mr. Folks was

11   out on pretrial release for a state violent felony, and

12   that's -- that's where I was confused as well.

13             MS. ROSS:  Your Honor, I can't -- as I am not

14   the author of the detention motion, I cannot speak to

15   why the -- you know, the characterization of it as being

16   violent.

17             THE COURT:  Okay.  Yes.  And I realize these

18   are written in haste and before the pretrial services

19   report was issued, but I think Mr. Straub is correct in

20   his argument that it wasn't a violent felony that

21   Mr. Folks was out on release for; is that -- is that

22   your argument?

23             MR. STRAUB:  That's correct.

24             MS. ROSS:  In the summer --

25             THE COURT:  Yes.

1          MS. ROSS:  In the summer of 2015?

2          THE COURT:  Yes.

3          MS. ROSS:  I would agree with that,

4     your Honor.

5          THE COURT:  Okay.  All right.

6          MR. STRAUB:  Judge, we would also dispute the

7     characterization that defendant stated that he acted as

8     muscle against drug traffickers in furtherance of the

9     conspiracy.  I don't have access to a DEA report on the

10    interview of the defendant at this time, so I don't know

11    exactly what the government is paraphrasing there, but I

12    don't believe that that is what was said to law

13    enforcement.  And furthermore, my client's physical

14    condition is such that he is not able to behave in that

15    way.

16         He is in a wheelchair today as the result, it

17    seems, of a worsening medical condition.  He was able to

18    walk into the courtroom just -- because your Honor

19    wasn't here, I think it's fair to note that when we were

20    here last week, he was able to walk into the courtroom

21    and walk on out, and has informed pretrial services, and

22    I think we mentioned it to Judge Reiss, that -- last

23    week, he was shot in the back a little over a couple

24    years ago.  He was in a wheelchair for quite a long time

25    and worked his way through braces and canes and is able

to walk for, you know, short distances, usually down to
the corner store, as he said it. If he is going to go
on a long trek, he would bring along a cane. However,
his condition has worsened over the last few days while
incarcerated.

Mr. Folks describes that he did get a medical
evaluation when he arrived at the jail and discussed
with them his dietary needs, said he has a condition
that prohibits his consumption of meat and he sticks to
a vegetarian diet when he has choice, but that was not
able to be provided to him at the jail over the weekend
even though they seemed -- Mr. Folks tells me that they
found in his prior detention records some notes that he
had been provided a vegetarian diet by the Vermont
Department of Corrections in the past. They weren't
able to get that into place, I imagine, in the short
period of time that he has been there. So he has not
eaten much in the last few days and that contributed to
a weakened state in terms of his ability to stand.

He describes getting -- attempting to get out of
bed in the middle of the night but falling out of his
bunk, striking his head on the plumbing fixtures that
are in the cell, and requiring stitches within his
mouth, giving him some bumps in about his head. And
because of his weakened condition, it seems the marshals

1     have provided him with a wheelchair for much of his

2     transport here today.

3        So his medical condition, we would argue, would

4     also militate in favor of his release where he would

5     intend to reside at home with his wife and his children,

6     who he has been with -- living with at the time of his

7     arrest.  He is integral to the family's support in terms

8     of receiving Social Security.  That would, I believe,

9     terminate after some period of time in jail, 30 or 60

10     days, I can't be certain, but that would discontinue at

11     some point if he was not in the community.

12        We'd ask the Court to consider that this Court

13     often releases individuals with these types of charges

14     into the community, that obviously the charge

15     Mr. Folks -- that Mr. Folks was convicted of in '92,

16     terribly serious, is a manslaughter charge, but he was

17     under the age of 18 at that time.

18        As represented to the probation office, he did

19     experience some parole violations, but those were due

20     to a -- well, misguided or mistaken, in a legal sense,

21     effort to see his children in Vermont, that he was bound

22     they would find him at his children's home here in

23     Vermont, and he was, you know, returned to custody.

24     That relates to the fugitive from justice charge, we

25     believe, in January of 2012, on page four of the report.

1    We'd ask the Court to consider that he does not

2    have a drug problem.  He had a negative UA, all

3    substances, and can be relied upon to appear when

4    necessary at court.

5    The probation office does not report any failures

6    to appear, I believe, in any of his state proceedings,

7    and therefore, we'd ask the Court to consider that he

8    can be released on the conditions recommended by the

9    probation office.

10    THE COURT:  Okay.

11    PROBATION OFFICER BENDZUNAS:  Judge?

12    THE COURT:  Yes.

13    PROBATION OFFICER BENDZUNAS:  There is one

14    failure to appear that occurred in September 26th of

15    2006, most likely a failure to {unintelligible}.

16    MR. STRAUB:  Thank you.

17    THE COURT:  Is that in the report?  I'm sorry.

18    PROBATION OFFICER BENDZUNAS:  Yes.  Yes, it

19    is, your Honor.

20    THE COURT:  I see it.

21    MR. STRAUB:  Pardon my oversight, your Honor.

22    THE COURT:  Yes.

23    Okay.  Miss Ross, before I hear your argument, let

24    me inquire, is the government moving on both risk of

25    flight and danger to the community or only one prong?

1  MS. ROSS: Your Honor, it is moving both on

2  risk of flight and danger to the community.

3  THE COURT: Okay. All right. I will hear

4  you.

5  MS. ROSS: Thank you, your Honor.

6  In light of the statements made by defense counsel,

7  the government does intend to call witnesses and produce

8  evidence.

9  THE COURT: Okay. Have you complied with the

10  Jencks Act responsibilities?

11  MS. ROSS: I have copies of the statements

12  which we are going to introduce, so -- for defense

13  counsel.

14  THE COURT: So Mr. Straub hasn't seen them as

15  yet?

16  MS. ROSS: Correct.

17  THE COURT: Okay. All right. Why don't we

18  take a brief recess to permit Mr. Straub an opportunity

19  to review these documents. Meanwhile, Miss Latulippe

20  can execute the release documents and be excused.

21  Mr. Jarvis, you --

22  (Brief pause.)

23  THE COURT: So I have an arraignment at 11:30

24  which should not take a very long period of time. Why

25  don't we go forward and conduct that 11:30 arraignment.

1    That would give Mr. Straub an opportunity to review the

2    Jencks material.

3              MS. ROSS:  Thank you, your Honor.

4              THE COURT:  So we will stand in recess.

5    (Court was in recess at 11:26 a.m.)

6    (The following was held in open court at 12:10 p.m.)

7              COURTROOM DEPUTY:  Your Honor, the matter

8    before the Court is a continuation of 16-CR-94, United

9    States of America versus Brian Folks, who is represented

10   by attorney Michael Straub, and Assistant United States

11   Attorney Heather Ross is appearing again for the

12   government.

13             THE COURT:  Okay.  It's 12:10.  Mr. Straub, I

14   am just curious about your client's state.  Has he had

15   any nourishment since breakfast?  Is he okay?  He can

16   proceed at this time?

17             MR. STRAUB:  Judge, he had a small breakfast,

18   I don't believe any lunch.  He seems comfortable

19   proceeding for, you know, another hour here --

20             THE COURT:  Okay.  All right.

21             MR. STRAUB:  -- or whatever it takes.

22             THE COURT:  Okay.  Good.  All right.

23             MR. STRAUB:  Thank you.

24             THE COURT:  Miss Ross?

25             MS. ROSS:  Thank you, your Honor.  The

government calls Agent Destito.

CHRISTOPHER DESTITO,

having been duly sworn by the courtroom deputy,

was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSS:

Q    Good afternoon.

A    Good afternoon.

Q    Just for purposes of the record, will you please
identify yourself and state what you do.

A    My name's Christopher Destito.  I am a special
agent with the Federal Bureau of Investigation.  I have
been so for 19 and a half years.  I have been assigned
to the Burlington office that whole time.

Initially when I came here, I worked white-collar
crime, reactive crime, and then had a period of time
where I was assigned to the drug task force, the DEA
Drug Task Force.  And after 9/11, I've worked terrorism
for approximately 12 years.  And then 2012 I was
reassigned to work gang investigations in the state,
which kind of falls under drug trafficking, weapons
trafficking, and prostitution.

Q    Thank you.

Now, Agent Destito, did you -- have you recently
been assigned to investigate a matter involving the

1  defendant, Brian Folks?

2  A    I have.

3  Q    And in the course of your investigation, have you

4  had an opportunity to review a report that deals with

5  some conduct of Mr. Folks on December 25th, 2015?

6  A    I have.

7  Q    And would you please describe for the Court what it

8  is you learned from reviewing that report.

9  A    December 25th, the evening of December 25th,

10  approximately 10:30, Mr. Folks was driving a Dodge

11  Durango --

12        MR. STRAUB:  Objection.  Hearsay.

13        THE COURT:  Hearsay is permissible in these

14  proceedings, so overruled.

15        MR. STRAUB:  Thank you, Judge.

16  A    Was driving a Dodge Durango and was stopped for a

17  traffic violation.  I believe, and I might be wrong

18  here, I think the taillights were out on the vehicle.

19        When officers approached the vehicle, they spoke

20  with Mr. Folks.  The officer I believe was Officer Bolio

21  from Essex [sic], and he was aware of Mr. Folks from

22  previous dealings, and Mr. Folks was, I think,

23  criminally suspended at the time of the stop, and

24  advised the vehicle was registered to someone else, Miss

25  Crawford, I believe it was.  And when asked about that,

1    he advised that he was on the way to the airport.  He

2    had to get a flight the next morning.  And through the

3    course of this stop, they -- they -- the officers that

4    did the stop ran a K-9 by the vehicle, and the dog

5    alerted to the vehicle.

6         They got a search warrant to search the vehicle,

7    and when they searched the vehicle, they found a nine

8    millimeter handgun in the glove compartment.

9         The vehicle was registered to Miss Crawford, I

10   believe, and when they spoke with Miss Crawford, they

11   asked consent to search the vehicle, and she denied

12   consent, so they got the warrant.  But when speaking

13   with Miss Crawford, she said that the vehicle was

14   Mr. Folks'.  He asked her to register it in her name.

15   At the time of the stop, Mr. Folks was the only one in

16   the vehicle.

17   BY MS. ROSS:

18   Q    That's what I was going to ask you so you just

19   answered that -- the question of who was in the vehicle

20   at the time of the stop.

21             THE COURT:  Could you ask the question who was

22   in the vehicle?  I didn't --

23             MS. ROSS:  Yes.

24             THE COURT:  Thank you.

25   BY MS. ROSS:

1  Q   Who was in the vehicle at the time of the stop?

2  A   Mr. Folks was the only one in the vehicle.

3  Q   He was the lone occupant, correct?

4  A   Yes.

5  Q   Now, did the presence of a handgun in the vehicle

6  have any significance to you as an agent, given what you

7  know about Mr. Folks' criminal history?

8  A   Yes.  Mr. Folks is not allowed to have a weapon per

9  his previous conviction.

10  Q   Now, Agent Destito, you had an opportunity last

11  week to interview Cassandra Folks; is that correct?

12  A   Yes.

13  Q   And who is Cassandra Folks?

14  A   That's Mr. Folks' wife.

15  Q   And when you spoke with Miss Folks, how did she

16  describe the -- the current living conditions with

17  respect to her and Mr. Folks?

18  A   Mrs. Folks was dealing with her children and one of

19  Mr. Folks' kids and is working a job trying to maintain

20  the household and, quite frankly, it's difficult.

21  There's, I believe, six children, and she had a lot on

22  her plate, and it was -- you know, it's a difficult

23  situation.  And she advised that in March of this past

24  year, her and Mr. Folks had an altercation -- not an

25  altercation.  They -- a disagreement, and -- because of

1   Mr. Folks' infidelity and the fact that he continues to

2   sleep with various women, and so Mrs. Folks kicked him

3   out of the house.  And she has been trying to resurrect

4   that relationship but hasn't been able to because of

5   Mr. Folks' inability to put aside that lifestyle that

6   she was asking him to do so.

7   So when we spoke with her, he was not living at the

8   house.  He hasn't been living at the house.  He had been

9   gone since March.  He does come back.  He does try to

10  see his kids.  And so it's not like he has disappeared,

11  but she doesn't know where he is living and where he --

12  or where he has been living.  But their relationship,

13  again, not -- at that time when we spoke with her prior

14  to Mr. Folks' arrest -- a good situation by any means

15  because, again, Mr. Folks's inability to be faithful.

16  Q    And when is it that you spoke with Mrs. Folks,

17  Cassandra Folks?

18  A    On the day of Mr. Folks' arrest.

19  Q    And if I am correct, was that Tuesday of last week?

20  A    Tuesday.

21  Q    Now, what, if anything, did Mrs. Folks say about

22  the level of financial support she was getting from

23  Mr. Folks?

24  A    Mrs. Folks at that time was behind on her rent and

25  was having trouble.  She is working a job trying to make

1  ends meet, and advised that Mr. Folks does, I think, try

2  to pay the cable bill but wasn't helping with rent.

3  Again, she was behind, and she advised that when he was

4  released from jail last year, she gave him $500 to

5  purchase clothes, I believe it was.  So she's, you know,

6  supporting him more than he is supporting her.

7  Q    Now, I would like to turn your attention to another

8  facet of the investigation.  Have you -- as part of your

9  role in this investigation, have you reviewed a report

10  of -- relating to a source of information, a source who

11  provided information in December of 2015?

12  A    I have.

13  Q    And can you share with us what, if anything, that

14  source of information stated about Mr. Folks' use of

15  firearms?

16  A    Mr. Folks has a couple people working for him in

17  his organization at that time, and this source advised

18  that he would purchase drugs -- or, excuse me, purchase

19  guns for those individuals and for himself, and this

20  source witness states straw purchase in Milton.

21  Q    And as you sit here today, do you recall where that

22  straw purchase took place?

23  A    It was -- Mr. Folks identified the weapon that he

24  wanted this individual to purchase for him, and then --

25  then the individual went in and purchased the handgun

1    for him in Milton, Vermont.  I don't remember the name

2    of the store that the weapon was purchased from.

3    Q    And would seeing a copy of the report that you

4    reviewed refresh your recollection?

5    A    Yes.

6         MS. ROSS:  Your Honor, may I approach the

7    witness?

8         THE COURT:  Sure.

9    Could you clarify something.  The witness testified

10   that the source of information witnessed the straw

11   purchase, but then it appears that the source conducted

12   the straw purchase.  I am confused by the testimony.

13        MS. ROSS:  Okay.  I will clarify that,

14   your Honor.

15   BY MS. ROSS:

16   Q    Agent, if you could take a moment to take a look at

17   the report, which has been marked for identification as

18   Government Exhibit 3, a copy of which has been provided

19   to the defense, and if you would -- if you wouldn't

20   mind, once you have had an opportunity to do that, let

21   me know if you can tell us where this straw purchase

22   took place.

23   A    The straw purchase took place at Bob's Gun Shop in

24   Milton, Vermont, and the witness witnessed -- or the

25   informant witnessed someone else purchase it, was

1    present when that individual purchased it.

2    Q    And does the report refresh your recollection about

3    who -- the name of the person who made the purchase for

4    Mr. Folks?

5    A    The individual that actually made the purchase was

6    Eric -- do not know the last name, but it's the

7    boyfriend of Keisha Willard/Willer.

8    Q    Okay.  And for how much was the gun purchased?

9    A    $400.

10   Q    And according to the source of information, who

11   provided that money?

12   A    Mr. Folks.

13   Q    Now, did the source of information provide any

14   other information about firearms with respect to

15   Mr. Folks?

16   A    I'm sorry.  Could you repeat the question, please.

17   Q    Yes.

18        Did the source provide any other information about

19   firearms with respect to Mr. Folks?

20   A    Yes.  That along with the gun, there was two clips

21   and ammunition provided as well, and that this

22   individual also said that he has provided weapons to the

23   individuals that worked for him.

24   Q    And as you sit here today, can you recall the names

25   of the two individuals who worked for Mr. Folks to whom

1    the source said he provided weapons?

2    A    One is identified as "G," and Shea, street names of

3    "G" and Shea.

4    Q    Okay.

5    A    Excuse me.  And Raj.  Excuse me.

6    Q    Now, with respect to what the source observed with

7    respect to firearms and these individuals who worked for

8    Mr. Folks, what did the source say?

9    A    I'm sorry.  Can you repeat the question, please?

10   Q    Sure.  Absolutely.

11        So what did the source say about these individuals

12   in terms of their possession of firearms?

13        I can ask it a different way.

14   A    Please.

15   Q    Did she specify or did the source explain where the

16   firearms came from?

17   A    They came from Mr. Folks.

18   Q    Okay.

19   A    Not specifically location where he had purchased

20   them, but they came from Mr. Folks.

21   Q    Okay.

22        MS. ROSS:  Those are all the questions I have

23   for Agent Destito at this time.

24        THE COURT:  Okay.

25        MR. STRAUB:  Thank you, your Honor.

```
1              THE COURT:  Yes.

2                      CROSS EXAMINATION

3    BY MR. STRAUB:

4    Q    Okay.  Sir, as I understand it, you were not

5    present for the situation in December that involved

6    Mr. Folks being stopped in an automobile and the search

7    of that vehicle?

8    A    No, I was not.

9    Q    Nor were you present for this interview of that

10   source of information that you are referring to in

11   December of 2015, correct?

12   A    No, I was not.

13   Q    Do you know the name of that source of information?

14   A    Yes.

15   Q    What is it, please?

16             MS. ROSS:  Objection, your Honor.  We are at

17   this time -- pursuant even to the rules of discovery and

18   the local rules, we would be entitled to keep certain

19   names -- not disclose certain names to the defense for

20   fear of the witness's safety, and we have that situation

21   in this case.

22             THE COURT:  It did --

23             MR. STRAUB:  Well --

24             THE COURT:  Go ahead.

25             MR. STRAUB:  Briefly, Judge.  I'm dealing with
```

1    third-hand hearsay through this officer about a source

2    of information providing some difficult information

3    about my client, allegedly.  I don't know how to cross

4    examine on -- I will ask some questions about what this

5    officer knows about that source of information and her

6    criminal history, but without the name, basically I am

7    not able to access whatever information I might be able

8    to access except through this officer to cross examine

9    anyone on this information.

10             THE COURT:  Okay.  At this point in time I am

11   going to sustain the objection.  I am not going to

12   require the government to disclose the name, but I am

13   going to put great weight behind your argument that what

14   credence to give to an anonymous witness who -- for whom

15   we don't know what their criminal history is, what their

16   history of substance abuse may be.  There's so many

17   things we don't know about this individual, and I'll

18   accept your argument in that regard.

19             MR. STRAUB:  Thank you.

20   BY MR. STRAUB:

21   Q    Sir, do you have a copy of the Government's Exhibit

22   1 in front of you, or just 3?

23   A    Just 3.

24   Q    But I understand that you reviewed the report

25   regarding the ammunition that was found in the car that

1    you have been discussing?

2    A    I have not shared that exhibit.

3    Q    Perhaps I misunderstood your testimony earlier.

4    What was your testimony about what form of gun or

5    ammunition was found in the vehicle?

6    A    If you are referring to the -- the traffic stop, is

7    that Exhibit 1?  Oh, I wasn't sure what you were

8    referring to.  There was a nine millimeter handgun.

9    Q    You sure it wasn't just a magazine and some rounds

10   of ammunition?

11   A    I might be referring to a different report.  May I

12   review it, please?

13   Q    What report are you referring to?

14   A    I don't know what exhibit number it is.

15   Q    What report did you review about that incident?

16   A    The traffic stop.

17   Q    What form of report was it?  Was it an incident

18   report?  Was it an affidavit of probable cause?  Do you

19   remember what the document was?

20   A    An incident report.

21   Q    And was it simply -- then I would like to show you

22   what's been marked as -- for identification as

23   Government's Exhibit 1, if I may.

24   A    Thank you.

25        Yes.  Thank you.

1    Q    Does that appear to be the document that you

2    reviewed?

3    A    Yes.

4    Q    I refer you to Bates stamp 131 of that document,

5    the right.  Does that appear to be the page?  Does that

6    appear to be describing the ammunitions that were found

7    in the vehicle?

8    A    This says, yes, a Beretta magazine and 10 nine

9    millimeter rounds.

10   Q    And what is a Beretta magazine?

11   A    It's a magazine that holds ammunition for a Beretta

12   handgun.

13   Q    Okay.  The property description does not describe

14   that a handgun was found, does it?  Is there another

15   page and --

16   A    Yes, I believe it's on the page before that, before

17   the one that you pointed out.  It says model 92 FS nine

18   millimeter handgun.

19          THE COURT:  Can I have some clarity here?

20   What is this document?

21          MR. STRAUB:  Judge, I'm sorry, perhaps I'll

22   just let the witness identify.

23       Can you identify what this packet of documents is

24   marked as Government's Exhibit 1?

25          THE WITNESS:  Your Honor, it's a -- it's a

1    series of reports generated from the traffic stop of

2    that evening.

3              THE COURT:  Prepared by whom?

4              THE WITNESS:  The officers that were involved,

5    your Honor.  There was a couple officers involved.

6              THE COURT:  And they were who?

7              THE WITNESS:  Officer Bolio from Essex, and

8    I'm -- I'm --

9              MR. STRAUB:  If I could perhaps help.

10   BY MR. STRAUB:

11   Q    Officer Bolio conducted the traffic stop?

12   A    Initially, yes.

13   Q    Yes.  And the property -- who conducted the search

14   of the vehicle?

15   A    I don't know.  The vehicle was taken back, and I

16   don't know who conducted the search.  Corporal Dewey

17   was, I believe, with the K-9 handler, and

18   officer -- it's a Polish last name, your Honor, that I

19   won't -- I'm not going to try to pronounce.  It's

20   C-Z- --

21   Q    Czuzuski?

22   A    Czuzuski.  It's a "ski"?  There's no -- I don't see

23   the "ski" at the end of it.  Sorry.  And then Officer

24   Lopez as well.

25   Q    Do you know who -- do you know whether the entry of

1    the gun being found in here was made by an officer or

2    some sort of administrative assistant or where that

3    information came from?

4    A    I don't know how the PD conducts their entries.

5    Q    You don't know who conducted the search?

6    A    Officers.

7    Q    You know whether that search was pursuant to a

8    warrant?

9    A    Yes.

10   Q    Have you reviewed that warrant?

11   A    I have not.

12   Q    Turning briefly back to the source -- confidential

13   source of information you were discussing earlier.

14   A    Yes.

15   Q    That -- the statements made by that individual were

16   made to -- in a proffer session, an interview with a

17   special agent, a task force officer and a couple of U.S.

18   Attorneys, correct?

19   A    Yes.

20   Q    Do you know whether that individual was charged

21   with a crime?

22   A    I do not.  It's an ongoing investigation.  I

23   don't -- I don't know whether that individual will be

24   charged yet or not.

25   Q    Thank you.

1          THE COURT:  Were any promises, offers, rewards

2     or inducements made to this individual to make these

3     statements?

4          THE WITNESS:  Your Honor, I wasn't there for

5     this proffer but that's the standard practice.  I would

6     say that there were not.

7          THE COURT:  Okay.  Miss Ross, were any offers,

8     rewards, promises or inducements made to this individual

9     at the time of the making of these statements?

10         MS. ROSS:  They were not, your Honor.  As the

11    report also details, that defense counsel has a copy of,

12    this individual is a heroin user and heroin addict.

13         THE COURT:  Okay.

14         MS. ROSS:  I believe she has a minimal

15    criminal history.  I am having that brought upstairs for

16    defense counsel's review.

17         THE COURT:  Okay.

18         MR. STRAUB:  Thank you.

19    BY MR. STRAUB:

20    Q    Now, as I have understood your testimony, this

21    individual reports that she believes that Mr. Folks gave

22    an individual some money to buy a gun last summer.

23    Correct?

24    A    Yes.

25    Q    She also states that she believes that all the guns

1    she saw at some location belonged to Mr. Folks, correct?

2    A    Yes.

3    Q    Paragraph seven.

4    A    Yes.

5    Q    Okay.  So -- but that individual didn't say that

6    she had any, you know, basis for that belief.  It's --

7    the report states that it was a belief on this

8    individual's part, correct?

9    A    Correct.

10   Q    Not that she had any knowledge about where all

11   those other guns -- who they belonged to or where they

12   came from.

13   A    The other guns, I don't know from this report.

14   Just the straw purchase that she was present for.

15   Q    Now, turning to your interview of Cassandra Folks

16   last week, did you generate any form of report or

17   statement regarding that interview?

18   A    That's in the process of being generated.

19   Q    Have you put, as we used to say, pen to paper yet?

20   Any form of a draft of that report exist anywhere?

21   A    It's not complete yet.

22        MR. STRAUB:  Your Honor, I'd ask that that

23   report be produced in whatever form it's in at the

24   moment, because it seems to go to some issues around the

25   stability of our proposed residence.

1          THE COURT:  Are there any notes?

2          THE WITNESS:  I have notes, your Honor.

3          THE COURT:  Okay.  I think it would be

4  appropriate to disclose the notes to --

5          MR. STRAUB:  Thank you.

6          THE COURT:  Okay.

7          MS. ROSS:  Your Honor, I have no problem

8  disclosing the notes and will -- if we have an

9  opportunity to take a break, we will have those brought

10  over.  I would point out, my understanding is that the

11  primary notetaker and the author of the report, whenever

12  it's prepared, is somebody with DEA, not Agent Destito.

13  So I just wanted to be clear about that.

14          THE COURT:  So you have no notes of your own?

15          MS. ROSS:  No.  I'm sorry.

16          THE WITNESS:  I do, your Honor.

17          MS. ROSS:  He has some notes.  I don't mean to

18  suggest he doesn't.

19          THE COURT:  Okay.

20          MS. ROSS:  It's just that he is not the author

21  of the report.

22          THE COURT:  Okay.

23          MS. ROSS:  And we will, like I said, have

24  those notes of Agent Destito's brought over.

25          THE COURT:  Okay.

1          MR. STRAUB:  Thank you.  Well, then, Judge, at

2     this point I would have no further questions but would

3     reserve an opportunity to look at those notes and follow

4     up.

5          THE COURT:  Okay.

6          MR. STRAUB:  Thank you.

7          THE COURT:  I want to ask the witness some

8     clarifying questions.

9          You referenced a traffic stop as the vehicle being

10    registered to Miss Crawford.  Who is Miss Crawford?

11         THE WITNESS:  An associate of Mr. Folks's.

12         THE COURT:  What do you mean "an associate"?

13         THE WITNESS:  Someone that he is -- worked

14    with.

15         THE COURT:  And did any -- was Ms. Crawford

16    asked about the -- either the nine millimeter handgun or

17    the magazine that was discovered in the car?

18         THE WITNESS:  I don't know, your Honor.

19    She -- those were discovered after their interview with

20    her.

21         THE COURT:  I see.  And what was discovered in

22    the car?

23         THE WITNESS:  A handgun.

24         THE COURT:  All right.  Did you participate --

25    you testified about the source of information.  Did you

1    participate in that interview?

2                    THE WITNESS:  I did not, your Honor.

3                    THE COURT:  Okay.  And did you participate in

4    the arrest of the defendant?

5                    THE WITNESS:  No, your Honor.  I was

6    conducting a search at -- at his -- at the residence.

7                    THE COURT:  And do you know anything about the

8    arrest of the defendant, with particular reference to

9    whether or not any weapons, drugs or other evidence was

10   discovered incident to that arrest?

11                   THE WITNESS:  I don't believe any weapons were

12   found, your Honor.

13                   THE COURT:  Any drugs?

14                   THE WITNESS:  I don't know, your Honor.

15                   THE COURT:  Are you aware of what Mr. Folks's

16   demeanor was?  Was he cooperative?

17                   THE WITNESS:  He spoke with the investigators,

18   your Honor.

19                   THE COURT:  Okay.  All right.  Any follow-up

20   based on my questioning?

21                   MR. STRAUB:  Yes, Judge.

22                   THE COURT:  Okay.

23                   MR. STRAUB:  Briefly.  Thank you.

24                        CONTINUED CROSS EXAMINATION

25   BY MR. STRAUB:

1    Q    The Court asked about Ms. Crawford, and you

2    described her as an associate of Mr. Folks.  What's the

3    basis of your knowledge -- well, let me ask it this way:

4    You are calling Miss Crawford an associate of Mr. Folks

5    because that confidential informant provided that

6    information, correct?

7    A    Among other things.

8    Q    Do you have -- all the information that you have

9    about Miss Crawford being -- well, I'm sorry.  If you

10   could --

11        So you are saying that besides that confidential

12   informant identifying Crawford as an associate of

13   Mr. Folks, you have other information that suggests

14   that?

15   A    Yes.

16   Q    And the -- well, what other information do you

17   have?

18   A    That he was familiar with Mrs. -- Miss Crawford and

19   that he has been to her house and was -- frequent her

20   residence.

21   Q    And what are the source's -- and where is your

22   source of information for that, in what you just

23   described?

24   A    The other defendant mentioned that he had been to

25   her house before.

1    Q    When did the defendant mention that?

2    A    Following her arrest.

3    Q    Following his arrest?

4    A    Her arrest.

5    Q    Her arrest.  Which defendant mentioned that before?

6    I'm sorry.  I'm --

7    A    Miss Latulippe.

8    Q    Miss Latulippe, okay.  So Ms. Latulippe said that

9    Mr. Folks had been to Crawford's residence?

10    A    Yes.

11    Q    And Mr. Folks said he was driving Ms. Crawford's

12    car and, in fact, the car was registered to her,

13    correct?

14    A    Yes.

15    Q    Other than Ms. Latulippe's statement that he had

16    been to the residence before and the information that he

17    provided that that stop in December he was driving her

18    car, is that -- are you referring to other information?

19    A    Those two.

20    Q    Those --

21    A    Those two.

22    Q    Those two.

23         MR. STRAUB:  Okay.  Thank you.  Nothing

24    further.

25         THE COURT:  Miss Ross?

1          MS. ROSS:  Your Honor, I have no redirect.  I

2  am wondering -- I am intending to call Agent Chetwynd as

3  well and wondering if your Honor would prefer that we

4  take a break now so that I can provide the defense

5  counsel with the notes and -- or at least get that in

6  process, getting him the notes and the criminal history

7  of the source of information as well as the statement of

8  the defendant, and then resume after a short break, or

9  would you like me to -- prefer that I call Agent

10 Chetwynd?

11         THE COURT:  Jeff, what's our schedule?

12         (Brief pause.)

13         THE COURT:  I have a hearing at two.  Counsel,

14 do you want to finish this proceeding or what's your

15 preference?

16         MR. STRAUB:  Judge, I have a bail hearing at

17 state court at 1:30.

18         THE COURT:  Okay.

19         MR. STRAUB:  And other matters in court later

20 in the afternoon.

21         THE COURT:  All right.

22         MR. STRAUB:  If I can have a moment to consult

23 with my client?

24         THE COURT:  Sure, sure.

25         (Brief pause.)

1          MR. STRAUB:  Judge, and to clarify, when the

2     government refers to the statement of the defendant, I

3     believe that that is a Facebook video, not any other

4     form of recorded statement?  Would you like to clarify

5     that?

6          MS. ROSS:  No.  You had raised in -- the

7     defense counsel had raised in its argument that it

8     disputed that the defendant had stated that he was "the

9     muscle" for other drug traffickers, which is in the

10    government's detention motion.  The government has now

11    had brought over the defendant's recorded interview, and

12    that's what I am referring to as -- as making available

13    to the defense and putting on in court.  It is separate

14    from the Facebook video.

15         MR. STRAUB:  May I ask the government about

16    how long that statement is so I can try and figure out

17    how long I need to review it?

18              MS. ROSS:  If I could have a minute, please?

19              MR. STRAUB:  Does the Court know -- I'm sorry.

20              (Brief pause.)

21         MS. ROSS:  I'm told the entire statement is

22    over an hour and that the statement -- the best estimate

23    is that the statements about muscle occur in the first

24    five to 10 minutes.

25              MR. STRAUB:  Obviously I need to review the

1      entire statement, your Honor.

2                 THE COURT:  Yes, you do.  Okay.

3          All right.  Well, you have to be in state court at

4      1:30; is that correct?

5                 MR. STRAUB:  Yes, Judge.

6                 THE COURT:  All right.  So I think it's

7      prudent that we continue this matter until tomorrow.  If

8      you have got a statement of your client that's over an

9      hour long, you're going to need to review it.

10                MR. STRAUB:  Yes, Judge.  I have to note,

11     Judge, that I am scheduled to be in a full-day hearing

12     tomorrow in state court starting at 8:30 through 4:30.

13                THE COURT:  All right.  How's Wednesday

14     morning?

15                (Brief pause.)

16                THE COURT:  All right.  This matter's going to

17     be continued until Wednesday at 3:30 for further

18     evidentiary proceedings in relation to the government's

19     motion for pretrial detention.

20         Are you available, Mr. Straub?

21                MR. STRAUB:  Yes, Judge.  That's perfect.

22     Thank you.

23                THE COURT:  Okay.  All right.  All right, the

24     Court will stand in recess.  Mr. Folks is under a

25     temporary order of detention pending the Court's

1     decision on this motion.

2                    (Court was in recess at 12:47 p.m.)

3                              *** ** ***

4

5

6                         C E R T I F I C A T I O N

7          I certify that the foregoing is a correct
      transcript from the audio record of proceedings in the
8     above-entitled matter.

9                                 _Anne Nichols Pierce_

10    May 5, 2017                 _____
      Date                        Anne Nichols Pierce
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25