**AFFIDAVIT**

I, Robert Estes, being duly sworn, depose and state as follows:

## I.  INTRODUCTION

1.  I am assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer (TFO). In connection with my duties and responsibilities, I have received extensive training in the field of narcotics investigation and enforcement, both formal and informal. I have also participated in investigations relating specifically to the possession and distribution of both heroin and crack cocaine, the types of drugs that are being distributed by the target subject under investigation and discussed herein. I have also participated in various aspects of investigatory work, including the use of social media to confirm links between criminal associates and to confirm criminal activity. I am familiar with the uses of Facebook, Backpage, Twitter, Snapchat, Instagram, SMS, and other chat applications and various other social media applications for criminal purposes.

## II.  PURPOSE OF AFFIDAVIT

2.  I make this affidavit in support of an application for a search warrant authorizing the search of seven electronic devices, to include four cell phones, a tablet, a GPS device, and a thumb drive (more fully described in Attachment A, and collectively, "the seven electronic devices"), for electronically stored information (more fully described in Attachment B).

3.  Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the seven electronic devices aided in committing violations of federal law -- specifically, distribution of and possession with intent to distribute heroin and cocaine base, conspiracy to distribute heroin and cocaine base, sex trafficking, and the unlawful possession of a firearm, in violation of 21 U.S.C. §§ 841(a) and 846; 18 U.S.C. §§ 1591 and 922(g)(1) -- and that there is probable cause to believe that the seven electronic devices have been used as a tool in committing these crimes. There is also probable cause to believe that the contents of the seven electronic devices will lead to evidence and fruits of such crimes.

4.  This case is being investigated by DEA Burlington, Vermont Resident Office (RO); the Federal Bureau of Investigation (FBI); and the Essex, Vermont Police Department (EPD).

5.  As a result of my personal participation in this investigation as well as information obtained by sources of information and confidential sources, I am familiar with the pertinent aspects of this investigation. Because I submit this affidavit for the limited purpose of establishing probable cause to search the seven devices, I have not included every aspect of the investigation known to me and to others in law enforcement.

1

## III. IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched is the content of seven electronic devices, as follows:

   a. Black TOMTOM Global Positioning System (Model: 4EN52 Z1230, C/NO: BL4331A00872), hereafter referred to as "DEVICE SIX";

   b. Black Nextar thumb drive (S/N: KH0810044529), hereafter referred to as "DEVICE SEVEN";

   c. Black AT&T cellular phone (Model: Z431, IMEI: 861831009055027, S/N: 325823530003), hereafter referred to as "DEVICE EIGHT";

   d. Black Alcatel cellular phone (Model: OT871AGPIB, IMEI: 013756006998738, S/N: HTJE53AHJMWI9E2), hereafter referred to as "DEVICE NINE";

   e. Pink Samsung cellular phone (Model: SPH-M350, DEC: 268435460105440949, HEX: A00000295305B5), hereafter referred to as "DEVICE TEN";

   f. Grey Nextel cellular phone (Model: IC402, IMEI:, S/N:), hereafter referred to as "DEVICE ELEVEN";

   g. Black Trio Stealth Lite Tablet (S/N: 1301107963), hereafter referred to as "DEVICE TWELVE";

All seven devices are described in Attachment A.

7. The requested warrant would authorize the forensic examination of the seven electronic devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## IV. PROBABLE CAUSE

## THE DRUG TRAFFICKING ORGANIZATION ("DTO")

8. On July 14, 2016, a federal grand jury indicted Brian FOLKS and charged him with conspiracy to distribute 28 grams or more of cocaine base and 100 grams or more of heroin, as well as substantive distribution of narcotics counts, in violation of 21 U.S.C §§ 841(a), 841(b)(1)(B), 841(b)(1)(C), 846, and 18 U.S.C § 2. Magistrate Judge John M. Conroy issued an arrest warrant for FOLKS the same day. The grand jury has since superseded two times in this case, adding additional charges against FOLKS related to human trafficking of four adults and one minor.

9. Details surrounding FOLKS' distribution of narcotics include the following:

a.  In December 2015, a source of information (SOI) advised investigators that a person known to him/her as "Mo" was selling heroin in the Burlington, Vermont area and assisted investigators in obtaining telephone number 802-825-4614 for "Mo." Based upon prior investigation and intelligence, "Mo" or "Moe" was an alias known to investigators to be associated with Brian FOLKS. DEA Intelligence Analyst (IA) Marilyn Epp entered this telephone number into Facebook, and a profile for a "Moet Hart" of Winooski, Vermont, appeared, with publicly visible photographs of a male as the profile user. I reviewed these Facebook photographs and recognized the male in the photographs to be Brian FOLKS. IA Epp showed the SOI a photograph from the "Moet Hart" Facebook profile, and the SOI also confirmed that to be a photograph of FOLKS.

b.  Throughout the first half of 2016, a DEA Burlington RO confidential source (CS) used telephone number 802-825-4614 to contact FOLKS to arrange and conduct controlled heroin purchases on behalf of DEA. The CS has a prior federal misdemeanor conviction for simple possession of oxycodone, and s/he was paid to operate as a DEA CS.

>   i.  During the week of January 4, 2016, SA Adam Chetwynd, IA Marilyn Epp, and I met with the CS. At the direction of agents, the CS made telephonic contact with the phone number 802-825-4614. During the call, the CS asked if the caller was "Moe." The male voice (hereafter referred to as FOLKS) responded, "Yeah." The CS asked if they could meet up. FOLKS responded, "Sure," and directed the CS to the area of Pearl Street Beverage in Burlington, VT. The CS told FOLKS that his/her previous heroin source of supply sold a sleeve (slang for 100 bags of heroin) for $800. FOLKS responded, "I don't discuss, ahh, I don't know what you're talking about...over the phone." The CS told FOLKS that s/he would call FOLKS when s/he was close. FOLKS responded, "Yeah." Several minutes later, FOLKS called the CS back from phone number 802-825-4614. FOLKS told the CS that he had an emergency and had to bail someone out in St. Albans. The CS asked if there was any way to meet up. FOLKS responded, "Well, I can, I can have somebody, you can go over there, and somebody else can meet up with you, and they can deal with you. Uh, it's my peoples.... What they have -- what you want on deck -- I'm not sure yet, because I'm not, I haven't been over there all morning yet. They can get as close as they possibly can for you." FOLKS instructed the CS to go to the area of North Union and Loomis Streets in Burlington, VT, to park, and to call FOLKS. Based on my training and experience, I understood FOLKS' instructions to the CS to mean that a person working with FOLKS as a part of the drug trafficking operation ("DTO") would sell heroin to the CS, but that he did not know how much heroin was available because he had not yet been to the residence where it was stored and prepared for distribution.

3

1. On the date of this meeting, the CS was outfitted with an audio/video transmitting device ("ATD") for the purpose of recording the anticipated meeting between the CS and FOLKS. The CS and CS' vehicle were searched for any illegal drugs, large sums of cash, or other contraband, with negative results. The CS was provided with $1,000 in pre-recorded funds.

2. The CS was followed to the area of North Union and Loomis Street where s/he parked. At this time, I heard the CS place a telephone call over the ATD. During the call, the CS advised that s/he was parked in the area of Loomis Street. The CS also described the make and color vehicle the CS was driving. I identified the male voice the CS was speaking with to be the same as the voice the CS spoke with earlier on phone number 802-825-4614, identified as FOLKS. FOLKS told the CS to hold on while he called somebody. Within seconds, an unknown female can be heard saying "hello" to the CS. FOLKS then told the CS, "Tell her where you at." The CS again described where s/he was parked and what s/he was driving. The unknown female voice responded, "Ok." The CS replied, "I'll see you in a minute" and thanked the female. The unknown female voice responded, "You're welcome."

3. Several minutes later, SA Chetwynd and I observed a white female walking on foot from the vicinity of 103 North Union Street. The female entered the CS' vehicle. The CS asked the unknown female if she had a full sleeve (100 bags of heroin). The unknown female responded, "He has six and a half," which I understood to mean 65 bags of heroin. The CS asked how much the 65 bags cost. The unknown female told the CS to hold on, because she had to add it up. The CS told the unknown female that s/he had not yet met Moe, but that Moe had instructed the CS to come and meet his "girl." The unknown female then told the CS that the 65 bags would cost "five hundred." The unknown female told the CS about how Moe had called and told her that he was going to do a three-way call. Agents then heard the CS counting to six over the ATD. The CS asked the unknown female her name, and she responded, "Mandy." Later, the CS identified a photograph of FOLKS' since indicted co-defendant Mandy LATULIPPE as "Mandy." LATULIPPE exited the CS' vehicle and returned down the driveway of 103 North Union Street, Burlington, VT towards Apartment #2. Prior investigation had identified 103 North Union Street, Apartment #2 as utilized by the FOLKS DTO.

4. SA Chetwynd and I followed the CS to a pre-arranged location where the CS immediately surrendered 65 wax paper folds

4

containing a brown powdery substance to me. The CS also returned $500 in pre-recorded funds to me. SA Chetwynd later field tested the substance, and the results were presumptively positive for the presence of heroin. The CS and CS' vehicle were searched again for weapons, large sums of money, and contraband, with negative results.

5. The CS was interviewed following the controlled purchase. The CS described the event and stated that "Mandy" sold the CS 65 bags of heroin for $500. The CS identified a photograph of LATULIPPE as "Mandy." Agents then directed the CS to send a text message to phone number 802-825-4614. In the text message, the CS thanked FOLKS and asked if the CS could see him again. FOLKS responded, "Sure you can," and "I wanted to talk to you and see what we could work out."

ii. During the week of January 10, 2016, a plan was formulated to utilize the CS to conduct a controlled purchase of 100 bags of heroin from FOLKS. SA Chetwynd, IA Epp, and I met the CS at a pre-arranged location where the CS advised s/he had been in telephonic communication with phone number 802-825-4614 from January 8, 2016 – January 12, 2016 to arrange a then-future meeting with FOLKS. The CS displayed the text messages on his/her cellular telephone that had taken place between the CS and phone number 802-825-4614. This message conversation was documented. While with agents, the CS placed a monitored call to phone number 802-825-4614. During the call, the CS asked FOLKS if they could meet. FOLKS told the CS to go to the same place as before in Burlington and to call phone number 802-825-4614 once there.

1. On the date of this meeting, the CS was outfitted with an ATD for the purpose of recording the anticipated meeting between the CS and FOLKS. The CS and CS' vehicle were searched for any illegal drugs, large sums of cash, or other contraband, with negative results. The CS was provided with $1,000 in pre-recorded funds.

2. The CS was followed to the area of North Union and Loomis Street, where s/he parked. At this time, I heard the CS place a telephone call via the ATD. During the call, the CS advised that s/he was parked in the area of Loomis Street and the type of vehicle s/he was driving.

3. Shortly thereafter, TFO Robert Sylvia observed a black male (later identified by TFO Daniel Merchand as Brian FOLKS) exit 103 North Union Street, Apartment #2. I observed FOLKS exit the driveway area of 103 North Union Street and enter the CS' vehicle.

FOLKS asked the CS, "Ok, what can I do for you?" The CS
replied that s/he needed a sleeve (100 bags of heroin). FOLKS
advised that he would have to put a sleeve together because he "ran
out of bags." FOLKS asked the CS how much time the CS could
wait around. The CS asked FOLKS how long it would take.
FOLKS responded that once he found some bags, he would "have
somebody put it together for [him], because [he] really do[esn't]
like doing it [him]self." FOLKS ultimately asked the CS to come
with him inside to purchase the heroin. Immediately thereafter, I
observed FOLKS exit the CS' vehicle and together, the CS and
FOLKS entered 103 North Union Street, Apartment #2.

4. While inside the apartment, I heard via the ATD the CS speaking
   with a female (later identified by the CS as LATULIPPE).
   LATULIPPE agreed to sell the CS 55 bags of heroin for $425.
   Shortly thereafter, TFO Sylvia observed the CS exit Apartment #2.
   I observed the CS return to his/her vehicle and depart the area.

5. SA Chetwynd and I followed the CS to a pre-arranged location
   where the CS immediately surrendered 55 wax paper folds
   containing a brown powdery substance to me. The CS also
   returned $575 in pre-recorded funds to me. SA Chetwynd later
   field tested the substance which tested presumptively positive for
   the presence of heroin. The CS and CS' vehicle were searched
   again for weapons, large sums of money, and contraband, with
   negative results.

6. The CS was interviewed following the controlled purchase. The
   CS advised that a black male (later identified by the CS as
   FOLKS) wearing a black puffy jacket and black baseball cap
   entered its vehicle. During their conversation, FOLKS told the CS
   that he could sell the CS a full sleeve of heroin but that it was not
   yet bagged up for distribution. FOLKS advised that he would sell
   a bundle of heroin to the CS for $75. The CS walked with FOLKS
   down the driveway to a rear apartment. The CS went into a
   bedroom where LATULIPPE handed the CS five wrapped bundles
   and five separate bags of heroin.

iii. During the week of January 14, 2016, a plan was formulated to utilize the
CS to conduct a controlled purchase of 100 bags of heroin from FOLKS.
SA Chetwynd, IA Epp, and I met the CS at a pre-arranged location and
directed the CS to place a monitored call to phone number 802-825-4614.
During the call, the CS asked FOLKS if they could meet up. FOLKS told
the CS to go to the same place as before. The CS advised that s/he would
call phone number 802-825-4614 once in the area.

1. On the date of this meeting, the CS was outfitted with an ATD for the purpose of recording the anticipated meeting between the CS and FOLKS. The CS and CS' vehicle were searched for any illegal drugs, large sums of cash, or other contraband, with negative results. The CS was provided with $1,000 in pre-recorded funds.

2. The CS was followed to the area of North Union and Loomis Street where s/he parked. At this time, I heard the CS place a telephone call via the ATD. During the call, the CS advised that s/he was parked in the area. FOLKS told the CS, "I'm about to send her out right now." Shortly thereafter, TFO Merchand observed two white females (later identified by SA Chetwynd and me to be LATULIPPE and Mary PROVOST) exit 103 North Union Street, Apartment #2, and walk towards North Union Street. DEA SA Timothy Hoffmann observed both females enter the CS' vehicle. While the CS' vehicle circled the block, I heard, via the ATD, LATULIPPE inform the CS, "All we have is only six buns," which I understood to be shorthand for "bundle." The CS asked LATULIPPE how much the six bundles cost. LATULIPPE responded, "$450." The CS then dropped both LATULIPPE and PROVOST back in the area of 103 North Union Street, and departed the area.

3. SA Chetwynd and I followed the CS to a pre-arranged location where the CS immediately surrendered what appeared to be 60 wax paper folds containing a brown powdery substance to myself. The CS also returned $550 in pre-recorded funds to me. SA Chetwynd later field tested the substance which tested presumptively positive for the presence of heroin. The CS and CS' vehicle were searched again for weapons, large sums of money, and contraband, with negative results.

4. The CS was interviewed following the controlled purchase. The CS advised that s/he pulled over and called FOLKS at telephone number 802-825-4614. During the call, FOLKS told the CS that he would send it out to him/her. LATULIPPE and another white female (later identified by the CS as PROVOST) got into the CS' vehicle. LATULIPPE sold the CS six bundles of heroin.

5. During processing of the above-described heroin, SA Chetwynd and I noticed that the CS had been given 61 bags of heroin from LATULIPPE instead of 60 bags of heroin. I directed the CS to send a text message to phone number 802-825-4614 explaining the mistake by LATULIPPE. On January 22, 2016, the CS sent the following text message to phone number 802-825-4614: "Hey I

7

met her and I just want to let u know there was 1 extra ticket, I just wanted u to now [sic] so we are straight up with each other." The 802-825-4614 telephone responded, "No doubt. Thank you." The CS replied, "Yeah no problem, I like to be straight up with ppl to keep a good relationship." The 802-825-4614 telephone responded, "You got an extra point with me already."

iv. During the week of February 7, 2016, a plan was formulated to utilize the CS to conduct a controlled purchase of 100 bags of heroin from FOLKS. SA Chetwynd, IA Epp, and I met the CS at a pre-arranged location and directed the CS to place a monitored call to FOLKS at phone number 802-825-4614. During the call, the CS asked FOLKS if they could meet up. FOLKS agreed and told the CS to go to the same location previously described.

1. On the date of this meeting, the CS was outfitted with an ATD for the purpose of recording the anticipated meeting between the CS and FOLKS. The CS and CS' vehicle were searched for any illegal drugs, large sums of cash, or other contraband, with negative results. The CS was provided with $900 in pre-recorded funds.

2. The CS was followed to the area of North Union and Loomis Street where s/he parked. At this time, I heard, via the ATD, the CS place a telephone call. During the call, the CS advised that s/he was there waiting. FOLKS told the CS that he was on his way. Approximately twenty minutes later, DEA SA Tom Doud observed FOLKS arrive in a vehicle and get dropped off. FOLKS walked over to the CS' vehicle and waited while the CS exited. TFO Sylvia then observed FOLKS and the CS enter 103 North Union Street, Apartment #2.

3. LATULIPPE was inside the apartment, and FOLKS instructed her to retrieve 100 bags (or one sleeve) for the CS to purchase. LATULIPPE left the apartment, and TFO Sylvia observed LATULIPPE approach a silver car parked in the parking lot, retrieve something from it, and return to the apartment. At the direction of FOLKS, LATULIPPE sold the CS four bundles of heroin. After the controlled purchase, the CS informed SA Chetwynd, IA Epp and me that FOLKS appeared agitated that there were only four bundles, rather than the agreed-upon amount of one sleeve. The CS stated that LATULIPPE seemed nervous and that FOLKS began pacing. After the CS departed 103 North Union Street, Apartment 2, TFO Sylvia observed PROVOST enter the apartment.

4. SA Chetwynd and I followed the CS to a pre-arranged location where the CS immediately surrendered four orange colored ziplock bags each containing a brown powdery substance to me. The CS also returned $580 in pre-recorded funds to me. SA Chetwynd later field tested the substance, which tested presumptively positive for the presence of heroin. The CS and CS' vehicle were searched again for weapons, large sums of money, and contraband, with negative results.

5. The CS was interviewed following the controlled purchase. The CS advised that s/he pulled over and called FOLKS at 802-825-4614. During the call, FOLKS told the CS that he was on the way. The CS then met FOLKS, and they went into the apartment together. Once inside, LATULIPPE sold the CS four bundles of heroin for $320. FOLKS also told the CS that he was bagging up his heroin differently.

c. The final controlled purchase into FOLKS occurred during the week of July 10, 2016. Members from the DEA Burlington Resident Office and Essex Police Department formulated plans to conduct a controlled purchase of heroin from Brian FOLKS utilizing an Essex Police Department CS ("CS#2"). The CS#2 is a paid Essex PD CS and has a misdemeanor conviction for being a minor in possession of alcohol, a misdemeanor conviction for simple assault, a misdemeanor conviction for petit larceny, a misdemeanor conviction for violation of conditions of release and violating probation, a misdemeanor conviction for providing false information to a law enforcement officer, a misdemeanor conviction for possessing less than two ounces of marijuana, a felony conviction for false pretenses or false tokens greater than $25, a misdemeanor conviction for retail theft of $100 or less, two misdemeanor convictions for retail theft of $900 or less, a misdemeanor conviction for operating a vehicle with a suspended license, and a misdemeanor conviction for false pretenses or false tokens of $900 or less.

i. On the date of this deal, SA Chetwynd, Essex Detective Chris May, and I met with CS#2 at a pre-determined location and directed CS#2 to place a recorded telephone call to Brian FOLKS for the purpose of purchasing three bundles of heroin. At approximately 2:05 p.m., CS#2 called FOLKS at 802-825-4614. CS#2 asked FOLKS if s/he could meet him. FOLKS responded that it depended where CS#2 was then located. CS#2 advised that s/he could travel to FOLKS' location. FOLKS told CS#2 to go to North Ave. CS#2 told FOLKS that s/he wanted "down," which I understood to be slang for heroin. FOLKS responded, "Alright, you need to stop on my phone." I understood that FOLKS was advising CS#2 not to refer to drugs on his phone. CS#2 apologized and asked where FOLKS wanted him/her to go on North Avenue. FOLKS told CS#2 to go to Rite Aid and stated that he would drive down to meet CS#2.

9

ii. I outfitted CS#2 with an ATD for the purpose of recording and transmitting the anticipated meeting between CS#2 and FOLKS, as well as another wire that merely recorded. I searched CS#2 for any illegal drugs, large sums of cash, or other contraband, with negative results. Det. May provided CS#2 with $300. I drove CS#2 to the area of the Rite Aid on North Ave and dropped off CS#2. TFO Dan Merchand, Det. May, and SA Chetwynd maintained surveillance of CS#2, as CS#2 walked from my vehicle on North Avenue towards the Rite Aid parking lot located at 1024 North Avenue, Burlington, VT. While CS#2 was en route to the Rite Aid, Det. May and SA Chetwynd overheard, via the ATD, a beeping sound, followed by CS#2, who advised out loud, "He's telling me to walk around the side towards the park." TFOs Matthew Cannon and Rob Sylvia observed CS#2 walk from North Avenue through the Rite Aid parking lot across Ethan Allen Parkway, into Ethan Allen Park.

iii. DEA Resident Agent in Charge (RAC) Brian Villella observed two adult black males sitting on a bench adjacent to a playground area located on the west side of Ethan Allen Park, located at 1006 Ethan Allen Parkway, Burlington, VT. TFO Sylvia observed CS#2 meet one of these black males, later identified as FOLKS. At this time, I overheard via the ATD CS#2 say, "Long time, no see," and "Leave my phone there?" CS#2 later informed investigators that FOLKS was indicating his desire for CS#2 to leave his/her personal belongings on a bench near the second, unknown black male. CS#2 complied and left his/her belongings, including the ATD. TFO Sylvia observed both CS#2 and FOLKS walk together up a paved path towards the Ethan Allen Tower. During the walk, I identified the male's voice as FOLKS'. I later heard from the recording on the wire that CS#2 did continue to wear that while they walked on the path, FOLKS demanded that CS#2 pull bare his/her chest so that FOLKS could look for listening devices. The two then discussed a misunderstanding over the kind of drug that CS#2 was looking to purchase. FOLKS expressed that he thought that CS#2 had also wanted crack cocaine and that therefore he did not bring enough heroin to their meeting. As a result, FOLKS called someone on his phone and told this person to "walk over and grab two."

iv. Meanwhile, over the ATD, I heard the then-unidentified black male say "yo" and "alright." I then heard the sound of footsteps walking. Immediately thereafter, TFO Merchand observed a black male depart Ethan Allen Park and walk on foot in the direction of 96 Ethan Allen Parkway. While FOLKS and CS#2 waited on the path, FOLKS directed CS#2 to retrieve drugs from a hole in a wall, and then FOLKS and CS#2 walked back toward the park. A short time later, TFO Sylvia observed FOLKS and CS#2 standing together in the park. FOLKS walked away from CS#2 as the unknown black male returned from the direction of 96

Ethan Allen Parkway. TFO Sylvia observed FOLKS and the unknown black male pass each other and the unknown black male continue to where CS#2 was last seen standing. FOLKS waited a short distance away. Within seconds, TFO Sylvia observed CS#2 depart the park area while the unknown black male met up with FOLKS. TFO Sylvia watched as the two began to walk in the direction of 96 Ethan Allen Parkway.

v. SA Chetwynd and I followed CS#2 to a prearranged meet location where CS#2 turned over 30 wax paper folds in stacks of ten, wrapped with dark-colored elastic bands, and containing a brown powdery substance that field tested presumptively positive for the presence of heroin. I searched CS#2 again for weapons, large sums of money, and contraband, with negative results.

vi. CS#2 was interviewed following the controlled purchase. CS#2 advised me, SA Chetwynd, and Det. May that s/he met FOLKS in Ethan Allen Park near the playground. FOLKS was with another black male who was sitting on a bench. FOLKS told CS#2 to leave his/her cellular phones on the bench. CS#2 and FOLKS then walked up a path towards the tower. CS#2 told FOLKS s/he wanted three bundles of heroin. FOLKS stated that he only had one bundle. FOLKS then called someone. CS#2 provided FOLKS with $300. FOLKS and CS#2 walked further up the path towards the tower. FOLKS made CS#2 pull his/her top down, exposing CS#2's naked upper torso. CS#2 believed FOLKS was checking him/her for a wire. FOLKS directed CS#2 to retrieve a bundle of heroin from a hole in a wall. CS#2 then met the same black male who was with FOLKS earlier on the bench. The unknown black male gave CS#2 two "halves," or portions, of crack cocaine instead of heroin. CS#2 told FOLKS, and FOLKS told the unknown black male to go retrieve heroin. The unknown black male came back and provided two bundles of heroin to CS#2 while they were still in the park.

vii. Following the purchase, TFO Merchand observed a green Jeep Cherokee, bearing Vermont license plate GPA785 and registered to Danielle DEGENHARDT at 96 Ethan Allen Parkway, Unit 8, Burlington, Vermont, depart the driveway of 96 Ethan Allen Parkway. TFO Merchand identified the driver as FOLKS and the passenger as an unknown black male. On July 13, 2016, TFO Merchand requested a query of Burlington birth records. The records indicated that Danielle Deghanhart (incorrect spelling) is the listed mother of a child with the last name FOLKS. The birth records indicated the child was born in July 2012, and there was no listed father in the birth records for the child. Also, in January 2012, members from the United States Marshals Service arrested FOLKS on an outstanding arrest warrant at DEGENHARDT's residence.

d. On January 20, 2016, FOLKS was a passenger in a vehicle stopped by the Winooski Police Department. Also present in the vehicle were Mandy LATULIPPE, Mary PROVOST, and Mary ROBENSTEIN (the driver and registered owner of the vehicle). After a K-9 was deployed and subsequently alerted on the vehicle, all passengers were asked to depart the vehicle. During a consent search of the interior of the vehicle, 350 bags of heroin and 40 bags of crack cocaine were located in a black bag on the floor in front of the driver's seat. The heroin was packaged in plain, white glassine bags as well as small, clear folded baggies with red hearts or green alien heads on them. The crack cocaine was packaged in very small, blue zip lock baggies. With his smartphone, FOLKS recorded this traffic stop from where he sat inside the vehicle; these videos were discovered on the HP computer retrieved pursuant to search warrant from 96 Ethan Allen Parkway, where FOLKS was residing at the time of his arrest. In the videos, all persons in the vehicle are both seen and/or heard. Following the K-9 alert, after ROBENSTEIN departs the vehicle, FOLKS can be seen and heard instructing LATULIPPE to place something under "her seat." When PROVOST was interviewed by SA Chetwynd and myself on February 11, 2016, she discussed this traffic stop and stated that the bag of drugs recovered by law enforcement belonged to FOLKS. PROVOST also told investigators that she was body packing heroin and crack cocaine during this event, at the direction of FOLKS; these drugs were never found by police officers. PROVOST explained that she removed the drugs and threw them away after leaving the traffic stop, which angered FOLKS.

## THE HUMAN TRAFFICKING ORGANIZATION ("HTO") AND RELATED VIOLENCE

### VICTIM 1

10. During the week of December 6, 2015, and then again in the week of October 3, 2016, I and other law enforcement personnel met with a woman (VICTIM 1) from the Chittenden County area. VICTIM 1 admitted to suffering from a severe heroin addiction. Based on my observations of her, and my training and experience, I believe that VICTIM 1 was using heroin heavily in December 2015. In December 2015, DEA and the U.S. Attorney's Office repeatedly attempted to provide VICTIM 1 with access to drug rehabilitation, medical services, other social services, and assistance. Although she was at first somewhat receptive to these efforts, VICTIM 1 eventually became less cooperative with the people attempting to help her. VICTIM 1 has no criminal record.

a. Among other things, VICTIM 1 stated that FOLKS was a heroin and crack dealer in Chittenden County. VICTIM 1 said that FOLKS went by the nickname "Moe." VICTIM 1 admitted that she had assisted FOLKS' drug distribution business by, among other things, bagging up significant quantities of heroin and crack for distribution. VICTIM 1 stated that FOLKS would employ her together with other women at lengthy bagging sessions and that at times he would insist that the

women work in their underwear or completely nude in order to prevent them from stealing drugs.

b. VICTIM 1 stated that FOLKS used Lori Crawford's residence on Spring Street in Burlington, Vermont as a location for bagging up heroin and cocaine base and that VICTIM 1 had herself bagged drugs for FOLKS at this residence. I believe that it is worth noting that Crawford's apartment at 71-73 Spring Street is directly across the street from the Integrated Arts Academy, a public elementary school.

c. VICTIM 1 stated that she has seen FOLKS in possession of handguns.

d. VICTIM 1 identified telephone number 802-825-4614 as a telephone number belonging to FOLKS.

e. VICTIM 1 stated that she had first met FOLKS in approximately May 2015 and began working in his drug distribution organization immediately. Several months into their relationship, FOLKS suggested to VICTIM 1 that she work as a prostitute. VICTIM 1 first refused, but FOLKS subsequently withheld heroin from VICTIM 1 until she became ill due to withdrawal. While she was experiencing withdrawal, FOLKS transported her to a Chittenden County hotel for her first "date" as a prostitute. After VICTIM 1 engaged in sexual activity with a man in exchange for money at the hotel, FOLKS picked VICTIM 1 up, took over half of what she had been paid for the sexual activity, and provided her with more heroin to use. Thereafter, FOLKS supplied a steady stream of heroin to VICTIM 1 in what appeared to her to be an effort to keep her compliant with FOLKS' demands.

f. VICTIM 1 stated that FOLKS was also involved with and oversaw the commercial sex of other women. Among other things, VICTIM 1 stated that FOLKS took pictures of some of these women to be used in advertisements for commercial sex that were posted on the Internet website www.backpage.com. Based upon my training and experience, I know that the Internet website, www.backpage.com, is a website on which people can sell goods and services. I also know that www.backpage.com is used to advertise women and girls for sale to potential sex buyers. According to VICTIM 1, FOLKS blackmailed the women he forced into prostitution by threatening to post photographs that showed their faces and revealed their identities, accompanied by disparaging captions, if the women were not compliant with FOLKS' demands.

g. VICTIM 1 stated that one of the women who had bagged drugs for FOLKS has the first name of "Hannah" and has long curly red hair. The physical description that VICTIM 1 provided for "Hannah" is roughly consistent with the Facebook profile pictures of "Hannah Wavy," a Facebook friend of FOLKS'. DEA has subpoenaed the subscriber records of the telephone number associated with the Facebook page belonging to "Hannah Wavy," and those records show that the telephone number is subscribed to a woman by the last name of ACKLEY. I

compared the Facebook profile pictures of "Hannah Wavy" to a Vermont Department of Motor Vehicles photograph of Hannah ACKLEY, and I believe that Hannah ACKLEY is Hannah Wavy, who has since died after drowning in a bathtub following a drug overdose.

## SOI#2

11. During the week of December 6, 2015, IA Epp and Essex PD Det. Chris May met with a person (SOI#2) from the Chittenden County area. SOI#2 explained that s/he met FOLKS in 2015, and subsequently became aware of his drug trafficking and prostitution activities, by working for him as a runner and bagger at FOLKS' Spring Street trap house location. SOI#2 is not a heroin addict. SOI#2 has one misdemeanor charge of possession of less than 200 mg of heroin. The disposition of these charges is not reflected on SOI#2's criminal record.

    a. Among other things, SOI#2 told IA Epp and Det. May that s/he knows FOLKS to be the top drug dealer in the organization operating out of 71 Spring Street and also in charge of "overseeing" the advertisement of prostitutes on an online site and the safety of prostitutes. In exchange for this service, according to SOI#2, FOLKS collects half or more of the money received as payment for the commercial sex act. SOI#2 described FOLKS as a pimp to young women who are addicted to heroin. SOI#2 stated that s/he was aware of two women who performed commercial sex acts for FOLKS. SOI#2 described a prostitution advertisement that FOLKS posted on www.youtube.com under his moniker "Moet Hart."

## VICTIM 2

12. During the week of October 23, 2016, SA Destito and IA Epp met with a person (VICTIM 2) from the Chittenden County area. VICTIM 2 has a felony burglary charge and a misdemeanor charge for domestic assault, however the disposition of these charges is not reflected on VICTIM 2's criminal record. VICTIM 2 has a misdemeanor conviction for heroin possession and a misdemeanor conviction for eluding a law enforcement officer.

    a. VICTIM 2 admitted to a history of drug use that began at age 19 and subsequent prostitution. VICTIM 2 explained that she met FOLKS after FOLKS answered her online advertisement for commercial sex. At this first meeting, FOLKS asked her whether he could pay her for the sex act in heroin, and she acquiesced. Thereafter, FOLKS became the supplier of heroin for VICTIM 2, and VICTIM 2 paid FOLKS either in cash or in sex acts.

    b. VICTIM 2 stated that FOLKS asked her three or four times to work for him as a prostitute before she finally acquiesced, in the summer of 2016, due to experiencing symptoms of severe heroin withdrawal, known colloquially as feeling "dope sick."

c. Before her first commercial sex act for FOLKS, VICTIM 2 asked FOLKS for heroin. FOLKS and VICTIM 2 argued before FOLKS finally gave VICTIM 2 "a few tickets" before the act, with the promise of future heroin upon completion of the act. Based on my training and experience, I recognize this to be a coercive dynamic common in the sex trafficking world.

d. According to VICTIM 2, FOLKS and Sarah MUNGER drove her to a trailer in Colchester, where an older, mentally disabled male lived, and there FOLKS took sexually suggestive pictures of VICTIM 2 with his phone and posted them to the internet, also with his phone, on www.backpage.com.

e. According to VICTIM 2, FOLKS received a response the same night as the initial posting of her advertisement online. FOLKS and MUNGER drove VICTIM 2 to the Staples parking lot in South Burlington, where VICTIM 2 was paid $100 for sexual intercourse with an unknown male. VICTIM 2 thereafter lied to FOLKS and stated that she had only received $50 in exchange for performing oral sex, all of which FOLKS collected from VICTIM 2. That same night, according to VICTIM 2, FOLKS told VICTIM 2 that he was prostituting other girls.

**Moet Hart Facebook Video**

13. On February 11, 2016, Mary PROVOST was in touch with Grand Isle Police due to being threatened the day before by FOLKS. SA Chetwynd and I met with PROVOST, who stated that FOLKS had accused her of stealing crack cocaine and heroin from the car parked at 103 North Union Street. According to PROVOST, FOLKS pushed PROVOST to the ground and held a gun to her head. PROVOST stated she was kept at 103 North Union Street, Apartment 2, for several hours until FOLKS decided to let her leave. PROVOST stated she understood Hannah ACKLEY to be the perpetrator of the theft.

a. On March 4, 2016, FOLKS posted what appears to be a homemade or amateur video on the "Moet Hart" Facebook profile, starring FOLKS himself telling the story in monologue fashion of how FOLKS helped ACKLEY while her paramour was in prison, by giving her "work" and paying for meals and clothes. In the video, FOLKS identifies ACKLEY by showing a photo from her "Hannah Wavy" Facebook profile. FOLKS then goes on to state that ACKLEY became "hands-y with things" and "start[ed] putting her hands on things that didn't belong to her." As such, FOLKS stated, he had to "make the bitch walk around in a fucking apron." At this moment in the video, a picture of ACKLEY, apparently nude other than in an apron, appears on the screen. FOLKS also states, in essence, that his "whole team" knows and thinks about Ackley "like this," at which point still photographs of a woman are shown. In one, the woman, who is clothed, is leaning back on a chair with her legs spread. The focus of the photograph is on her mid-section. The second photograph depicts what appears to be the same woman bent over her chair with her buttocks facing the camera in a sexual

position. Based on my training and experience, the video itself, my discussions with others, and my work on this case, I believe that FOLKS is stating that his associates know and think about Ackley in a sexualized and demeaning manner.

14. From my training and experience, I know that people use Facebook to connect with other users for a variety of reasons and interested including criminal enterprise. While some items on a particular Facebook page may be publicly viewable, other items (whether inculpatory or exculpatory) may be hidden from public view by the user and/or Facebook policy. Also from my training and experience, I know that people typically use smartphones, tablets, and computers such as those named in Attachment A to film, produce, post, edit, and save such videos, and often such videos can be found stored in the kinds of devices listed in Attachment A.

## CS#2 and the Undercover Agent

15. During the week of July 10, 2016, DEA and FBI agents attempted to introduce an undercover agent (UC) to FOLKS in the hopes that FOLKS would be interested in recruiting the UC as a prostitute in his sex trafficking organization.

   a. In July 2016, CS#2 advised me that approximately one month prior, CS#2 received a text message from FOLKS requesting that CS#2 find FOLKS girls that would be willing to work in FOLKS' sex trafficking organization. CS#2 deleted the text message before showing the message to me. In a recorded telephone call made in my presence, CS#2 telephonically contacted FOLKS and advised that CS#2 had a girl that FOLKS might be interested in. FOLKS requested that CS#2 send him a photo of the girl. CS#2 sent a photograph depicting only the UC's face. FOLKS requested that CS#2 send a photograph of the UC's body. CS#2 complied, and FOLKS asked to meet the UC after seeing the full body photograph. FOLKS instructed CS#2 to meet him in Burlington.

   b. DEA agents established surveillance on FOLKS, who was observed driving around downtown Burlington in a white Volvo SUV with two other individuals. FOLKS and the other two in the vehicle stopped on West Allen Street in Winooski. FOLKS then got out of the white Volvo SUV and walked on foot to 241 West Canal Street, where DEA SA Brandon Hope observed FOLKS appear to enter Apartment #1A. CS#2 made a recorded call to FOLKS and advised FOLKS that CS#2 was with the UC and that they were in Burlington. FOLKS instructed CS#2 to stay at that location, and FOLKS was observed walking back to the white Volvo on West Allen Street, which then drove directly to CS#2's location in Burlington.

   c. FOLKS was videotaped walking to the UC vehicle and meeting with the UC and CS#2. During that meeting, FOLKS advised the UC that he did not want to talk about his organization at that location because he was afraid of their conversation being recorded. FOLKS said he would be willing to meet the UC in a hotel where they could put their heads together and discuss the UC working for FOLKS.

When the UC attempted to engage FOLKS in conversation about his organization, FOLKS stated that he would talk to the UC in his vehicle but not in anyone else's vehicle. FOLKS stated that he was afraid of getting arrested. The meeting concluded with FOLKS instructing the UC to contact him when the UC had more time to meet with FOLKS.

d. SA Hope observed the white Volvo leave the parking lot where the UC meet took place and drive to and park at 96 Ethan Allen Parkway. Surveillance units observed FOLKS walk on foot from the UC meet location to the white Volvo parked at 96 Ethan Allen Parkway. An unknown male and female were observed exiting the vehicle and walking with FOLKS toward Unit #8. In the walkway of Unit #8, FOLKS lifted up a blue tarp and appeared to remove a set of keys. FOLKS then used a set of keys to open and enter Unit #8, followed by the unknown male and female. Based on the observations about 96 Ethan Allen Parkway during the a controlled purchase during the week of July 10, 2016, and the undercover meeting this same week, I believe that FOLKS was using 96 Ethan Allen Parkway as his new trap house, after 103 North Union became unavailable.

## VICTIM 3

16. During the week of November 28, 2016, Det. May and other law enforcement personnel met with a woman (VICTIM 3) from the Chittenden County area. VICTIM 3 admitted to suffering from a severe heroin addiction and to having engaged in prostitution. VICTIM 3's criminal record includes 3 misdemeanor convictions for retail theft of $900 or less, a misdemeanor conviction of possession of a depressant/stimulant/narcotic of less than 100x dosage amounts, a misdemeanor conviction of possessing a controlled substance (7th degree) and for possessing a hypodermic instrument. VICTIM 3 also has a misdemeanor charge of providing false information to a law enforcement officer which is pending disposition, and a misdemeanor DUI charge with an unknown disposition.

17. VICTIM 3 stated that she was introduced to FOLKS by her father, also a longtime narcotics dealer in the Burlington area. At the time, VICTIM 3's father explained to VICTIM 3 that FOLKS was "into" prostitution and drug dealing. VICTIM 3 further stated that a woman known as "Pinky" worked with FOLKS and was later the person who taught VICTIM 3 "the trade," which I understand to mean "prostitution."

18. VICTIM 3 recalled that when she was seventeen or eighteen years old, FOLKS brought her to a photographer in the University Mall who also owned a lingerie business. VICTIM 3 stated that she consented to sexual intercourse with the photographer as payment for the photographs. VICTIM 3 stated that she has never seen those photographs.

19. VICTIM 3 further stated that she performed commercial sex acts at FOLKS' behest, at the Day's Inn in Colchester, Vermont. According to VICTIM 3, FOLKS was not then

dealing heroin but merely keeping enough on hand to prevent VICTIM 3 from detoxing. Based on my training and experience, I recognize this to be a coercive dynamic common in the sex trafficking and prostitution world. VICTIM 3 further stated that after VICTIM 3 would meet a "client," she would perform a sex act for money and later give half of the money to FOLKS.

20. VICTIM 3 stated that after a certain point, she stopped working for FOLKS, as she was not "making any money." VICTIM 3 later reconnected with FOLKS when he was frequenting a residence near the H.O. Wheeler School in Burlington. VICTIM 3 stated that several other people stayed at this residence as part of FOLKS' DTO. On one occasion, VICTIM 3 stated, she observed FOLKS inside this residence, holding "an AK," which I understand to mean a rifle.

21. VICTIM 3 stated that she then again began to perform commercial sex acts at FOLKS' behest, and FOLKS provided her with a phone to use for this purpose. VICTIM 3 further explained that FOLKS did all of the advertising for the commercial sex acts, by way of postings on the internet. VICTIM 3 stated that she worked out of a local hotel, she would secure transportation from a member of FOLKS' DTO, or that a client would come collect her. As before, VICTIM 3 paid FOLKS or a person working for FOLKS half of the money she earned for the commercial sex act.

22. VICTIM 3 described one incident when VICTIM 3 stole five bags of heroin from "Chrissy," who worked for FOLKS. In retaliation, FOLKS grabbed her by the body and informed VICTIM 3 that she was lucky that he did not kill her. FOLKS then led VICTIM 3 to a car and advised her that she would have to work off the five stolen bags of heroin. VICTIM 3 stated that based on the circumstances, she believed that the only way to avoid being physically beaten by FOLKS was to have sexual intercourse with him. FOLKS brought VICTIM 3 next to a dumpster inside a cemetery near Riverside Avenue. FOLKS provided VICTIM 3 with heroin. VICTIM 3 advised FOLKS that any sex act between them was not consensual and explained that the encounter would have appeared to be a rape to any passer-by.

23. Subsequently, according to VICTIM 3, FOLKS advised her that she then worked for him, and he brought her to a residence in Burlington. FOLKS informed VICTIM 3 that she would have to provide part of the money that she earned to FOLKS in order to stay at that residence.

24. VICTIM 3 described a variety of methods that she believed FOLKS used in order to exert control over her. VICTIM 3 specifically noted that FOLKS would show VICTIM 3 pornographic or sexually suggestive photographs of VICTIM 3 in FOLKS' possession as a coercive, blackmail threat.

**YouTube Video and VICTIM 4**

25. From the internet website, www.youtube.com, which is a website that allows people to post video files to the internet, DEA has recovered a video posted on August 3, 2013

under the name "Moet Hart." As noted above, that is the moniker used on the Facebook account associated with FOLKS. The title of the video posted by Moet Hart is "atouchofclassywomen.com." The video is approximately 36 seconds long, and it depicts a young-looking woman lying on a bed talking on a cellular telephone. The woman is wearing a short skirt, and approximately halfway through the video she turns from her back to her stomach and lifts up the skirt, partially revealing her upper thighs. The focus of the camera is on her legs and buttocks. Also on the video, the young woman can be heard speaking on the phone. Among other things, she states that her name is "Ashley" and asks into the telephone, "Do you want a naughty girl or a good girl tonight?" She later states, "It's 100 for a half hour, 150 for an hour." Based on the video clip, the video's title, law enforcement's work on this investigation, and my training and experience as a law enforcement officer, I believe that the young woman is discussing commercial sex and that the video is itself an advertisement for commercial sex.

    a. This woman has since been identified as VICTIM 4. VICTIM 4 is from the greater Chittenden County area and has no criminal history. VICTIM 4 met with SA Destito and IA Epp and stated the following:

        i. VICTIM 4 met FOLKS when she was 17 years old and soon fell in love with him and began a sexual relationship. VICTIM 4 told FOLKS that she was 18, but provided FOLKS her actual birth certificate, which showed that she was 17.

        ii. VICTIM 4 heard rumors that FOLKS sold women and drugs, but she did not believe the rumors initially. VICTIM 4 was homeless and needed money and asked FOLKS to help her. FOLKS posted VICTIM 4 on backpage.com, using pictures FOLKS took of VICTIM 4 in her bra and panties in a hotel room. FOLKS wrote and paid for the advertisement and showed it to VICTIM 4. VICTIM 4 received a call within half an hour for her first "date." This occurred in 2012.

        iii. The rates set by FOLKS were $100 for 15 minutes, $150 for 30 minutes and $250 for an hour. Initially, the agreement was for FOLKS to take half of the money from VICTIM 4's prostitution for providing security, but as time went on, FOLKS took all of the money. FOLKS provided VICTIM 4 crack cocaine when VICTIM 4 asked for it, and soon she became addicted.

        iv. VICTIM 4 visited New York City with FOLKS and his cousin, Brady. VICTIM 4 witnessed instances where FOLKS and/or Brady entered residences in the New York area and returned to the vehicle, in which she waited, with a backpack. Following the return to Vermont with the backpack, FOLKS often gave out free drugs to the women working in commercial sex for FOLKS.

     v. VICTIM 4 had an affair with Brady Folks. Brian FOLKS discovered the affair because he had rented two motel rooms for prostitution and kept a baby monitor in the room in which girls were working so that he could monitor their activity. FOLKS heard VICTIM 4 and Brady having sex over the baby monitor. FOLKS became angry because Brady had not paid for the sex.

## Backpage Records

26. At the time of our interview of VICTIM 1 in December 2015, she possessed a cellular phone that FOLKS provided her for the purpose of accepting "dates" with customers arranged by him and set up through www.backpage.com. VICTIM 1 also stated that FOLKS monitored this phone daily. The number for this telephone was 802-777-2705. Subscriber records for this phone number indicate that it was activated in October 2015, which corresponds with VICTIM 1's recall of the timeline of events. Backpage's response to a grand jury subpoena for telephone number 802-777-2705 shows advertisements for commercial sex that include photographs of VICTIM 1 and another, unknown female. Since then, many records associated with FOLKS and other women who worked for FOLKS in this capacity have been received via grand jury subpoena.

## PHYSICAL EVIDENCE

27. On July 19, 2016, FOLKS was arrested by DEA outside of Ethan Allen Parkway, Burlington, Vermont. The unknown black male referred to in paragraphs IV(8)(c)(iii)-(vi) was present, also arrested, and identified as Victor GIBSON.

    a. At the time of FOLKS' arrest, 96 Ethan Allen Parkway, Unit 8, was the location where FOLKS was residing and where FOLKS was witnessed before and after a controlled purchase of heroin in July 2016. 96 Ethan Allen Parkway, Unit 8, is the residence of Danielle DEGENHARDT, one-time paramour of FOLKS, and with whom FOLKS raises a child. Ariel Otero, a female, was also staying there at that time.

    b. At the time of FOLKS' arrest, two cellular devices were in his possession (DEVICES ONE AND TWO, subject of a prior search warrant). When associate Victor GIBSON was arrested, one cellular device was in his possession (DEVICE THREE, subject of a prior search warrant). When 96 Ethan Allen Parkway, Unit 8, Burlington, Vermont was searched incident to FOLKS' July 19 arrest, a tablet (DEVICE FOUR, subject of a prior search warrant) and a Hewlett-Packard computer (DEVICE FIVE, subject of a prior search warrant) were located. Danielle DEGENHARDT, who rents the apartment and who has a child with FOLKS, told investigators that these items belonged to FOLKS.

    c. DEVICES ONE through FIVE have since been searched and forensically imaged, and – among other things – over 100 potential victims of human trafficking have been identified as a result.

d. When 96 Ethan Allen Parkway, Unit 8, Burlington, Vermont was searched incident to FOLKS' July 19 arrest, one GPS was located (DEVICE SIX), one thumb drive was located (DEVICE SEVEN), four cellular devices were located (DEVICES EIGHT, NINE, TEN and ELEVEN), and one tablet was located (DEVICE TWELVE).

e. DEVICE SIX was found while searching a bag DEGENHARDT said belonged to FOLKS. DEVICE SIX was located in a brown bag that also contained items labeled with FOLKS' name, such as a prescription bottle from Rite Aid Pharmacy. This brown bag was found in the dining/living room area where DEGENHARDT told investigators that FOLKS kept his belongings.

f. DEVICES SEVEN through TWELVE were found in a bag on a coat hook at the bottom of the stairs off of the kitchen of 96 Ethan Allen Parkway, Unit 8. The bag also contained a digital scale and very small, blue zip lock bags matching those used to package the crack cocaine seized by Winooski Police Department on January 20, 2016, from the vehicle in which FOLKS was a passenger.

All seven devices were seized by law enforcement personnel and preserved as evidence. They are currently safeguarded at the Burlington Resident Office of the DEA.

28. Based on my training and experience I know the following:

a. Persons who participate in the distribution of controlled substances and human trafficking frequently use cellular telephones, tablets, GPS devices, and thumb drives, among other communications devices, to safeguard, coordinate and facilitate their unlawful activities, and to maintain contact with suppliers and consumers of illegal drugs as well as "johns" and victims of sex trafficking.

b. Information stored in the memories of these communication devices constitutes evidence of drug and human trafficking. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, location information pertinent to criminal activity, and the records of telephone numbers to which calls were placed and from which calls were received.

c. With their cellular phones and tablets, drug and sex traffickers often take photographs or videos of other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, women in various states of undress as advertisement for commercial sex, and other useful evidence. It is not unusual for such photos to show large quantities of money or other drug and sex proceeds, or sexualized images of women, as both sex and drug trafficking are largely cash-based businesses. These photographs can be stored within the cellular phone or tablet, as well as transferred to a thumb drive for safekeeping.

## V.    CRIMINAL HISTORY

29.  IA Epp ran FOLKS' criminal history which revealed a felony conviction for first degree manslaughter and a felony conviction for displaying a weapon.  Brian FOLKS is identified by FBI number 653398NA4 and State ID number 6982507P.

## VI.    TECHNICAL TERMS

30.  Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

   c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital

data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31. Based on my training and experience, and a review of the Internet relating to the features of phones that I believe are similar or identical to the devices that are the subject of this application, I believe that some of these devices have some of the above-described capabilities, and that others are likely to have some of these capabilities. In my training and experience, examining data stored on cell phones with such capabilities can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VII.  ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. *Forensic Evidence*: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how and when the four communication devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that things that were once stored on the four communication devices may still be stored there, for at least the following reasons:

a. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium is a dynamic process. Electronic evidence is not simply data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular thing is not present on a storage medium.

34. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying for would permit the examination of the four communication devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant. The process of completing a search and analysis of the four communication devices may take longer than 10 days to complete.

35. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

# VIII.  CONCLUSION

36. For the reasons outlined above, I believe there is probable cause to believe that the seven electronic devices, described with particularity in Attachment A, contain evidence, instrumentalities, and fruits of crimes as described with particularity in Attachment B.

Robert Estes, Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this ___/_9_th_ day of _Oct._ , 2017

John M. Conroy
U.S. Magistrate Judge